## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Jeffery Richard Kindle and<br>Aislinn Sabrina Kindle,<br><br>                                        Debtors. | Case No. 17-01245-dd<br><br>Chapter 13<br><br>**ORDER CONFIRMING CHAPTER 13 PLAN** |

This matter is before the Court to consider confirmation of a chapter 13 plan filed by debtors Jeffery Richard Kindle and Aislinn Sabrina Kindle ("Debtors") on July 26, 2017 [Docket No. 21]. Pamela Simmons-Beasley, the chapter 13 trustee ("Trustee"), objected to confirmation of Debtors' plan [Docket No. 17].[1] A hearing was held on September 18, 2017. At the conclusion of the hearing, the Court took the matter under advisement and gave the parties an additional ten (10) days to submit supplemental briefs. Both parties submitted briefs on September 28, 2017 [Docket Nos. 32, 33]. The Court now issues this order.

## FACTS

1.    Debtors filed their chapter 13 case on March 14, 2017 and filed their schedules on the same date.

2.    Their Schedule F lists student loans owed to Navient in the total amount of $64,249.05. Navient filed proofs of claim for both Debtors' student loans, reflecting that Mrs. Kindle owes a total of $19,574.01, and Mr. Kindle owes a total of $44,622.19, for a total amount owed of $64,196.20. Mr. Kindle's student loans were consolidated in 2002, and Mrs. Kindle's

---

[1] Debtors' original chapter 13 plan was filed on March 14, 2017 [Docket No. 7]. Trustee filed her objection to confirmation on May 4, 2017 [Docket No. 17]. Debtor's amended plan filed July 26, 2017 contained numerous changes, but the basis for Trustee's objection remained, and so her objection remained outstanding despite the filing of the amended plan.

loans were consolidated in 2013. The proofs of claim filed by Navient reflect that Debtors made payments on both consolidated student loans for at least the six months preceding their bankruptcy filing. Interest totaling approximately $200.00 per month accrues on the student loans. The last payment on the student loans is due after the date of Debtors' proposed final plan payment.

3. Mr. Kindle testified that his student loans are not eligible for deferment, but that Mrs. Kindle's are. However, Mr. Kindle testified that Debtors had not attempted to defer her student loan payments because interest would continue to accrue on the loans while they were in deferment. Mr. Kindle further testified that deferring the student loans would not have an effect on his employment or on Debtors' lifestyle or financial circumstances.

4. Debtors enjoy income above the South Carolina median. Debtors' initial Form 122C, the means test form, filed on March 14, 2017, showed monthly disposable income of $855.09. Debtors filed an amended means test form on August 28, 2017, showing monthly disposable income of $830.09. There is no contention that the form is not correctly completed. There is no liquidation value that must be paid to creditors.

5. Debtors' Schedule I and J list combined monthly income of $6,408.08 and monthly expenses of $5,430.92, leaving Debtors with $977.16 per month. Listed as an expense on Schedule J is a student loan payment in the amount of $476.21.

6. Debtors have three children, ages 13, 16, and 18. Mrs. Kindle does not work outside the home; however, Debtors' Schedule I indicates that she is considering seeking part-time at-home employment. At the time of the hearing, Mrs. Kindle had not located any employment, and Mr. Kindle testified that it did not appear she would be likely to obtain employment in the near future due to ongoing medical issues.

7. Mr. Kindle testified that Debtors did not anticipate any significant changes to their income or expenses in the next few years.

8. Debtors owe general unsecured claims in addition to their student loans in the amount of $90,097.69.

9. Debtors' July 26 plan proposes total trustee payments of $900.00 per month for 5 months, followed by payments of $975.00 per month for 55 months. Debtors' July 26 plan also proposes that Debtors will continue to directly pay the student loans, making payments of $476.21 per month. Over the course of the 60-month plan, this will result in Debtors' student loan creditors receiving 44.51% of their claims. Under this proposed plan, other general unsecured creditors will receive 33.30% of their claims.

10. If Debtors' student loan creditors were paid through the plan along with the other general unsecured creditors, the unsecured creditors would receive approximately 36.48% over the course of the plan. Because of the standard order in which trustees in South Carolina distribute payments to creditors,[2] according to the parties' stipulation of facts filed on September 15, 2017, disbursements to general unsecured creditors would not begin until approximately month thirty (30) of the plan.

11. Interest and fees will continue to accrue on the student loans during the term of the bankruptcy case, including during the time that unsecured creditors are awaiting distribution.

## ARGUMENTS OF THE PARTIES

Debtors argue that their proposed chapter 13 plan does not unfairly discriminate against non-student loan unsecured creditors, because Debtors propose to pay more than their means test disposable income into the plan for non-student loan unsecured creditors. Therefore, Debtors

---

[2] Distributions are typically made first to administrative claims and secured claims, then to priority claims. Unsecured creditors only begin to receive distributions after these claims are fully paid.

3

argue, even though their student loan creditor is receiving a slightly higher percentage than other general unsecured creditors by being paid outside the plan, the classification does not unfairly discriminate because the non-student loan unsecured creditors are receiving all they are entitled to under the means test. Debtors also argue that the separate classification of the student loan has a good faith, reasonable basis because requiring Debtors to pay the student loan with their other general unsecured creditors would result in substantial interest and late fees accruing on the student loans, increasing the amount owed on the loans at the conclusion of the bankruptcy case and interfering with the purpose of Debtors' bankruptcy case, obtaining a fresh start.

Trustee responds that the separate classification of the student loan creditor does in fact unfairly discriminate against other general unsecured creditors, because the student loan creditor will receive more favorable treatment than other unsecured creditors. Trustee also asserts that Debtors' means test disposable income is merely a starting point, and that the income listed on Schedules I and J, along with judicial discretion and common sense, should be used to determine a debtor's projected disposable income. Trustee points out that Debtors have options for lowering Mrs. Kindle's student loan payments, such as deferment, which have not been taken advantage of, and that Debtors also have the option of raising their plan payments even further to pay non-student loan creditors at the same rate as the student loan creditor.

Trustee argues that the purpose of chapter 13 is to ensure that debtors pay their creditors the maximum that they can afford to pay, not whatever figure results from means test calculations. Trustee concedes that all separate classification of student loans should not be disallowed, but proposes a bright line rule that, in situations similar to Debtors', "where Debtors are above median, employed, and have shown no exceptional circumstances for why the student loan should be paid, that a difference of less than 10 percent between student loan creditor treatment versus the general

4

unsecured creditors is fair." Because here, the difference is approximately 11%, Trustee argues that unfair discrimination exists.

## ANALYSIS

"The twin aims of bankruptcy are to provide equitable distribution of assets for creditors, and to provide a fresh start for a debtor." *In re Shelton*, 370 B.R. 861, 868 (Bankr. N.D. Ga. 2007) (citing *Burlingham v. Crouse*, 228 U.S. 459, 472-73 (1913)). However, the bankruptcy concept of equal distribution does not mean <u>all</u> creditors must receive equal distribution; instead, this concept means that there must be equal distribution with respect to similarly situated creditors. One exception to this general concept is set forth in 11 U.S.C. § 1322(b). Section 1322(b)(1) states that a plan may "designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated." Any separate classification under section 1322(b) is "discrimination"; however, such discrimination may be permissible, unless it is unfair. *See Bentley v. Boyajian (In re Bentley)*, 266 B.R. 229, 237 (1st Cir. 2001) ("Discrimination among classes of creditors, on the other hand, *is* subject to limitation. The plan 'may not discriminate unfairly against any class so designated.' Before determining what this phrase prohibits, we note first that it tacitly *permits* some measure of discrimination between different classes. In prohibiting only such discrimination as is unfair against any class, § 1322(b)(1) signals that a plan may, to an extent, treat different classes differently. So a plan may discriminate, but not unfairly."). Section 1322(b)(5) expressly allows a debtor to cure a default and maintain direct payments on certain claims, such as the student loan debts at issue here, stating that a plan may "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." Thus, the

5

Bankruptcy Code expressly allows the discrimination proposed here – the remaining issue then, is whether the discrimination is unfair.

## I. Projected Disposable Income

Before determining whether the proposed separate classification unfairly discriminates, the Court must address the parties' arguments regarding how to calculate Debtors' projected disposable income. 11 U.S.C. § 521 sets forth a variety of documents a debtor must file, including:

> (B)(ii) a schedule of current income and current expenditures;
> . . .
> (iv) copies of all payment advices or other evidence of payment received within 60 days before the date of the filing of the petition, by the debtor from any employer of the debtor;
> (v) a statement of the amount of monthly net income, itemized to show how the amount is calculated; and
> (vi) a statement disclosing any reasonably anticipated increase in income or expenditures over the 12-month period following the date of the filing of the petition.

Additionally, Fed. R. Bankr. P. 1007(b)(6) provides:

> A debtor in a chapter 13 case shall file a statement of current monthly income, prepared as prescribed by the appropriate Official Form, and, if the current monthly income exceeds the median family income for the applicable state and household size, a calculation of disposable income made in accordance with § 1325(b)(3), prepared as prescribed by the appropriate Official Form.

Section 1325(b) provides, in relevant part:

> (b)(1)  If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan –
>
> . . .
>
> (3) Amounts reasonably necessary to be expended under paragraph (2), other than subparagraph (A)(ii) of paragraph (2), shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income, when multiplied by 12, greater than –
>
> (A) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

6

    (B) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

    (C) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $700 per month for each individual in excess of 4.

In sum, then, a chapter 13 debtor is required to file schedules of current income and current expenditures – Schedules I and J – as well as, if the debtor's income exceeds the median family income for South Carolina, complete a "means test" calculation of disposable income using the formula established for chapter 7 cases. Debtors, who are above-median, have filed all required forms and documentation in their chapter 13 case.

    11 U.S.C. § 1325, discussing the requirements for confirmation of a chapter 13 plan, provides, in relevant part:

> (b) (1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan –
>
> (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>
> (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.
>
> (2) For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended –
>
> (A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and
> (ii) for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to

7

exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

In *Hamilton v. Lanning*, 560 U.S. 505 (2010), the United States Supreme Court considered how to calculate a chapter 13 debtor's projected disposable income. In *Lanning*, the debtor had received a one-time buyout from her former employer in the six months prior to the filing of her chapter 13 petition. *Id.* at 511. This caused her means test disposable income to be $1,114.98 per month. *Id.* However, the debtor only received income of $1,922.00 per month from her new job, leaving her, after expenses, with disposable income listed on Schedule J of $149.03 per month. *Id.* As a result of the debtor's means test disposable income, the chapter 13 trustee argued that the debtor was required to make plan payments of $756.00 per month for 60 months; however, both the debtor and the trustee conceded that the debtor's actual income was insufficient to allow her to make payments in that amount. *Id.* at 512. The debtor proposed a plan that would require payments of $144.00 per month for 36 months. *Id.* at 511. The Supreme Court held that the best approach in determining an above-median debtor's projected disposable income is to use the debtor's disposable income from the means test as a starting point, and then make any necessary adjustments for "changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation." *Id.* at 524.

After *Lanning*, the Fourth Circuit twice considered the question of how to calculate projected disposable income. First, in *Morris v. Quigley (In re Quigley)*, 673 F.3d 269 (4th Cir. 2012), the debtor proposed a chapter 13 plan that surrendered two all-terrain vehicles. The payments on the ATVs were included as expenses in the debtor's means test calculation of disposable income, as were payments on a truck that were actually being made by the debtor's ex-

8

boyfriend. *Id.* at 270. The trustee objected on the basis that the debtor's proposed plan did not allot all of the debtor's projected disposable income to plan payments, since the debtor had deducted the amount of the ATV and truck payments. *Id.* at 271. The bankruptcy court found that the truck payments should not have been deducted from the calculation of the debtor's income, because the debtor's ex-boyfriend was already making those payments. *Id.* at 271. However, the bankruptcy court found that the ATV payments could be deducted because projected disposable income could only be based on the six months prior to the bankruptcy filing. *Id.* The district court affirmed. *Id.* However, the Fourth Circuit reversed, citing *Lanning*. The Fourth Circuit found that when calculating projected disposable income, *Lanning* requires adjustments be made to disposable income to account for any known or virtually certain changes in either income or expenses. *Id.* at 273.

The Fourth Circuit again considered the issue of the calculation of projected disposable income after *Lanning* in *Mort Ranta v. Gorman*, 721 F.3d 241 (4th Cir. 2013). The primary issue in *Mort Ranta* was whether Social Security income should be included in the calculation of projected disposable income. The Fourth Circuit found that Social Security income is excluded from projected disposable income. *Id.* at 251. In doing so, the Fourth Circuit again discussed *Lanning*, and stated:

> Following *Lanning*, a debtor's "projected disposable income" is based on the debtor's "disposable income," give or take any adjustments necessary to account for foreseeable changes in that income. Because the Code expressly excludes Social Security income from "current monthly income," and thus, "disposable income," it follows that Social Security income must also be excluded from "projected disposable income." Indeed, every other circuit to address this issue has arrived at the same conclusion.

*Id.*

9

In sum, it appears that the law in the Fourth Circuit is that for an above-median debtor, the debtor's means test disposable income is the starting point for determining projected disposable income, and that adjustments should be made only to account for those changes to the debtor's income or expenses that are very likely or certain to occur. Debtors made the student loan payments listed on their schedules for at least the six months prior to their bankruptcy filing. They propose to continue these payments, as section 1322(b)(5) allows. Accordingly, including these payments in Debtors' forward-looking budget does not constitute a change to Debtors' income or expenses that is likely or certain to occur in the future – these expenses were part of Debtors' budget well before their bankruptcy case was filed and are permitted as part of Debtors' plan. Trustee presented no evidence indicating that changes to Debtors' income or expenses were likely to occur, and in fact, Mr. Kindle testified that he did not anticipate any significant changes to Debtors' income and expenses. The existence of additional disposable income using Schedules I and J in the event student loan payments are not continued by Debtors is not a change in circumstances. As a result, under *Lanning* and the Fourth Circuit's subsequent opinions, no adjustments to Debtors' means test disposable income are necessary in order to arrive at Debtors' projected disposable income. Debtors' projected disposable income, and the amount Debtors are required to pay to unsecured creditors, is $830.09 per month, the amount reflected on their means test.

## II.    Unfair Discrimination

The Court has determined that Debtors' projected disposable income in this case is limited to the amount set forth in their means test. The Court must next determine whether Debtors' separate classification of their student loan creditor unfairly discriminates against Debtors' other unsecured creditors. As set forth above, section 1322(b)(1) provides that a debtor's chapter 13

plan may "designate a class or classes or unsecured claims . . . but may not discriminate unfairly against any class so designated." Historically, South Carolina has used the following five factor test to determine whether a chapter 13 plan's proposed classification unfairly discriminates:

> (1) whether there is a reasonable basis for the classification;
> (2) whether the classification is necessary to the debtor's rehabilitation under Chapter 13;
> (3) whether the discriminatory classification is proposed in good faith;
> (4) whether there is a meaningful payment to the class discriminated against; and
> (5) the difference between what the creditors discriminated against will receive as the plan is proposed, and the amount they would receive if there was no separate classification.

*In re Belton*, C/A No. 16-03040-JW, 2016 WL 7011570, at *6 (Bankr. D.S.C. Oct. 13, 2016) (citations omitted). However, in *Belton*, Judge Waites stated:

> While the undersigned is unwilling to abandon the framework established by my predecessors on the Court, it appears that factor five, the difference in payment percentage, has been unduly emphasized in prior cases. Therefore, in my view, the following streamlined test better reflects the balance of factors pursuant to which a debtor must submit evidence to enable the Court to analyze the separate classification of unsecured debt:
> (1) Is there a good faith, rational basis for the separate classification;
> (2) Is the separate classification necessary to the debtor's rehabilitation under Chapter 13; and
> (3) Is there a meaningful payment to the discriminated class.

*Id.* at *7. Judge Waites also stated that "[h]elpful, but not controlling to this analysis, is evidence indicating whether the proposed distribution is greater than would be received by the unsecured creditors in a Chapter 7 liquidation, and the degree of difference in distributions between a plan containing separate classifications and one without." *Id.* at *7, n.11. Other courts have developed a variety of tests. *See Labib-Kiyarash v. McDonald (In re Labib-Kiyarash)*, 271 B.R. 189, 192 (B.A.P. 9th Cir. 2001) (utilizing four part test from *Amfac Distribution Corp. v. Wolff (In re Wolff)*, 22 B.R. 510 (B.A.P. 9th Cir. 1982): "(1) whether the discrimination has a reasonable basis; (2) whether the debtor can carry out a plan without the discrimination; (3) whether the discrimination

11

is proposed in good faith; and (4) whether the degree of discrimination is directly related to the basis or rationale for the discrimination."); *In re Pracht*, 464 B.R. 486, 492 (Bankr. M.D. Ga. 2012) (citing *In re Harding*, 423 B.R. 568, 575 (Bankr. S.D. Fla. 2010) (adopting test that requires a "fair balancing of: (1) the Debtor's fresh start; (2) the clear legislative objective of student loan repayment; and (3) fair treatment of creditors as a whole."); *In re Orawsky*, 387 B.R. 128, 146-47 (Bankr. E.D. Penn. 2008) (adopting framework using four "baselines" warranting consideration: 1. Equality of distribution, 2. Nonpriority of student loans, 3. Mandatory versus optional contributions, and 4. A fresh start for honest debtors; stating that the degree of departure from the baseline is relevant in determining whether discrimination is unfair); *In re Kolbe*, 199 B.R. 569, 575 (Bankr. D. Md. 1996) (after discussing various tests employed by courts, adopting a test which requires consideration of the same five factors historically used in South Carolina); *In re Furlow*, 70 B.R. 973, 978 (Bankr. E.D. Penn. 1987) ("[D]ifferent treatment is permissible if and only if the debtor is able to prove a reasonable basis for the degree of discrimination contemplated by the Plan.").

Although courts employ a variety of different tests and approaches in considering what constitutes unfair discrimination, nearly all tests involve considering the totality of the circumstances in each case. A totality of the circumstances approach is, and, based on the tests adopted in South Carolina and other districts, has always been, the proper framework for determining whether a classification unfairly discriminates against other creditors.

In this case, the totality of the circumstances indicate that Debtors' proposed treatment of their student loan creditor does not unfairly discriminate against their other general unsecured creditors. As discussed above, non-student loan unsecured creditors are actually receiving more than a strict application of the means test would yield - Debtors are voluntarily contributing their

12

discretionary income (the difference between their means test disposable income and their Schedule J disposable income) to increase the amount paid to those creditors. This voluntary contribution above and beyond what Debtors are required to pay under the means test indicates good faith on the part of Debtors in seeking to repay their creditors. Debtors' voluntary contribution results in non-student loan unsecured creditors receiving approximately 33% on their claims – a significant percentage in a chapter 13 case.

Additionally, and importantly, there are reasonable bases for the proposed discrimination. Interest on Debtors' student loans equals nearly $200.00 per month. If Debtors are not allowed to continue making regular payments on their student loans, interest will continue to accrue at this significant rate. In addition, because distributions to general unsecured creditors will not begin until about thirty (30) months into the plan, default charges will also be added to the loans until the student loan creditor begins receiving payments from the trustee. Even once trustee payments to the creditor begin, the payments may not be sufficient to cover the default charges, much less the regular payments. All of this will likely result in Debtors owing more on their student loans at the end of their bankruptcy case than they did when the bankruptcy began. Because student loans are nondischargeable, Debtors' successful completion of their bankruptcy case will have put them in no better position – at least with respect to their student loans – than they were in prior to their bankruptcy filing. This result is not consistent with the Bankruptcy Code's purpose of providing debtors with a fresh start. Although the fact that student loans are nondischargeable alone does not justify separate classification of those types of claims,[3] their nondischargeable character, taken with the rest of the circumstances present, indicate that the student loans in this case may be separately classified.

---

[3] *See In re Kalfayan*, 415 B.R. 907, 910 (Bankr. S.D. Fla. 2009) ("Most courts have concluded that discrimination based solely on nondischargeability is unfair.").

Trustee argues that the Court should adopt a bright line rule that in situations where Debtors are above-median, employed, and have not shown exceptional circumstances relating to their student loans, any difference in payment between student loan creditors and other unsecured creditors of more than ten percent should be considered unfair discrimination. First, as set forth above, whether a classification discriminates unfairly should be determined on a case by case basis using a totality of the circumstances approach. Further, even if a bright line rule were appropriate, using a percentage to determine what constitutes unfair discrimination would not be proper. In some cases, even a five percent difference between the amounts a student loan creditor and other general unsecured creditors are receiving could be large. However, in other cases, such as this one, a ten percent difference may be much less significant. In this case, non-student unsecured claims will receive a total of approximately 33%, or $30,003, over the life of the plan. If Debtors' student loan creditor were to be paid with other general unsecured creditors, the unsecured creditors, including the student loan creditor, would receive a total of approximately 36.48%, or $56,289.79 over the life of the plan. This means that, excluding the student loan creditor, general unsecured creditors would receive approximately $32,867.64 over the life of the plan – only $2,864.64 more than they would receive if the student loan creditor is paid outside the plan. In the circumstances of this case only, the Court finds that the separate classification of Debtors' student loan creditor does not unfairly discriminate against other unsecured creditors.

Concern was also raised that if the student loan creditor is being paid directly, it may be difficult to monitor whether the student loan payments are actually being made. While Federal Rule of Bankruptcy Procedure 3002.1 was recently adopted to impose various reporting requirements relating to claims secured by a debtor's principal residence and being paid directly to the creditor, no such rule exists for other types of creditors, including student loan creditors.

14

The parties note that 11 U.S.C. § 1328(a) provides that a debtor is only entitled to a discharge after completion of "all payments under the plan". Mr. Kindle testified that Debtors understand if they do not continue to make their student loan payments, they will not be entitled to a discharge at the end of their chapter 13 case. Debtors indicate that their certificate of completion of all plan payments will include certification of making the payments to the student loan creditor. If necessary, the trustee may seek verification of these payments at that time. The Court was not asked to, and is not ruling on, the section 1328(a) issue in the context of student loan payments. This order simply reports the agreement of Debtors and Trustee.

## CONCLUSION

For the reasons set forth above, Trustee's objection to confirmation is overruled, and Debtors' chapter 13 plan filed July 26, 2017 is confirmed. A separate order will issue.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**11/01/2017**



David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

Entered: 11/01/2017